Thank you, Kwame. The United States Court of Appeals for the Ninth Circuit is now in session. Good morning and welcome. Thank you very much for joining us today. Would counsel like to reserve any time for rebuttal? Yes, Your Honor. If I may, this is Alec Barron on behalf of the plaintiff appellant. I'd like to reserve three minutes for rebuttal if that's permitted. That's fine. Go ahead, please. Thank you, Your Honor, and may it please the Court. Your Honors, three months ago, this Court issued its opinion in Anderson v. Intel affirming dismissal of a very different complaint than Mr. Wehner's. Nonetheless, Genentech strenuously attempts to convince the Court that this case is on all fours with Anderson to solicit the same result. For several dispositive reasons, this complaint is vastly different than the complaint in Anderson and meets the pleading standard articulated by the Court. Accordingly, reversal of the District Court's dismissal order is warranted. First, the investment comparisons supporting plaintiffs' underperformance allegations are prescribed by the plan's own investment policy statement, or IPS, and that was established by Defendant Genentech. Specifically, the IPS required that each fund and portfolio would be monitored and evaluated against its specific benchmark, as well as a universe of funds with similar characteristics. We plead this at ER 102, among other places, and the language appears in the IPS at SER 160 and 163. In addition, the IPS provides that each active investment, including the challenge Roche TDFs, should perform market universe investments for rolling three- to five-year periods. These are the exact comparisons presented in the complaint, and they support an inference that Genentech failed to appropriately monitor the plan's investments. In the California Ironworkers case, this Court found, quote, fiduciaries who are responsible for plan investments governed by ERISA must comply with the plan's written statements of investment policy. For this reason, other courts, including in circuits where the meaningful benchmark standard has been adopted, have found that comparisons supported by a plan's IPS are sufficient to give rise to an inference of imprudence. In fact, in the Dish Network case, the Court called these allegations part and parcel of direct allegations that defendants ignored their own selected criteria for monitoring the prudence of plan investments. In the Anderson case, there were no allegations whatsoever that the plan's investment required the kind of review presented in the complaint. To the contrary, the IPS in Anderson only required a specific benchmark comparison that the at-issue investments surpassed. Plaintiff's allegations in this regard are of an entirely different kind, and it's noteworthy that in Genentech's over 75 pages of briefing, it never once addresses this part of the IPS. Mr. Perrin, with respect to the, I guess, internal benchmark or the custom benchmark, do you concede that that was met, or why doesn't the complaint draw a comparison to the one named benchmark that the IPS calls out? Your Honor, we do concede that it met that benchmark, but the IPS in this case specified two criteria for monitoring, both that the custom benchmark was met, but also that peer investments in a universe of similar investments be surpassed in order to satisfy the monitoring criteria. So, we do acknowledge that the custom benchmark, and we explain in our briefing and complaint why we think that's less than probative of the performance of the investment. We concede that's met, but the other critical criteria here was not met, and we think that stands amount to a direct process allegation that the fiduciaries weren't applying the IPS appropriately in monitoring the investments for that criterion. Can we ask? Oh, go ahead, please. Well, I guess just with respect to the peers that you draw on the off-the-shelves, the, you only have, only the J.P. Morgan Fund is both a two-managed comparator, as well as an active comparator. Why should we pay attention to any of the other through-managed or passively-managed TDS funds? Sure, Your Honor. In this case, we would call special attention, I think, to the J.P. Morgan comparator because it shares those two characteristics, but as we also discussed in the complaint, the two-through distinction is a little bit of form over substance in the sense that it describes the landing point, but we also talk about the glide paths of the other comparators as being much more similar than the two-through distinction recognizes because that only speaks to when the terminal allocation becomes static, but in reality, when you line up the glide paths of all of the comparators that we proffer, and actually in some of Genentech's exhibits, they do this, the glide path of the Roche TDS is actually quite in line with all of the comparators that we proffer, and we think each of them do have probative value, and I think the Stanley, Black, and Decker court, which we discussed in our briefing, describes why having multiple comparators, even if certain of them aren't the perfect benchmark, may help confirm that some benchmarks are not simply cherry-picked, and directionally, we think all of them have relevance, and that's why we also have the S&P indices, which is the leading market index, and I would note in Anderson, the comparator that the plaintiffs offered was actually just the S&P 500, which is kind of the popular large cap index. It wasn't a targeted fund index, and so each of those additional comparators confirms the point here, which is that the underperformance was visible relative to everything that the IPS suggested defendants shouldn't have been looking at, save for the custom benchmark that was essentially fail-proof. I want to understand, go ahead, Judge Koh, I'm sorry. For your peer comparators, under Anderson, we have to find that they did not have a different aim, risk, or potential reward, and you do provide the aims for the off-the-shelf TDFs, but not the S&P target date indices, and then you don't provide the risks and potential rewards for any of those. If I'm wrong about that, can you point me to an allegation in the complaint that would provide that additional information that Anderson says we need to assess whether it's a true comparator? Sure, sure, and a couple different points I think I would mention. So first, I think the risks and aims analysis is different here than in Anderson, because in Anderson, the court found and the plaintiffs conceded that the target date funds customized for the Intel plan had a very specific deviant set of risk and aims, and that was after the 2008 financial crisis. The fiduciaries redesigned the target date funds to specifically minimize risk and recognize that that would come at the expense of performance, and that was actually disclosed to participants. And so the risk and aim analysis in Anderson I think is relative to manifestly different set of risk and aims for those TDFs, which is not. But still, Anderson said you had to make allegations about the risks and aims of the so-called peer funds, and I understand that you understand that in Anderson that made those allegations about the target funds may have been made. But again, I'm interested in what Judge Koh asked. Did you make any allegations in the operative complaint about the risks and aims of the so-called peer funds, or is it your position that you don't have to because they were in the IPF? Well, so I think our position is sort of twofold. I think on the one hand, the IPS analysis sort of stands aside this question from Anderson because it explains what the fiduciaries established as their own. I understand that argument. So let's assume for a moment that I don't buy that argument, and I think you still have to make allegations about the so-called peer funds so that they can be compared to the funds that are offered. Judge Koh asked you where those allegations were in the operative complaint. You may have answered that, but I'm not sure I got the answer. Would you tell me where they are? To be fair, I don't think I completely got there. I think that's in our discussion about the glide paths, about the construction of target date funds. Tell me what paragraphs of the operative complaint make the allegations that you think suffice. I do want to address, I think, what was part of your question. I think the risks and aims here we are able to speak about in a more generalized way because there wasn't a particular state of set of risks and aims with regard to the Roche TDFs in the same way that there was in the Anderson case. And then I think our discussion about the peer off-the-shelf TDFs begins at paragraph 146 of our complaint, and that's ER99. And we talk about the concentration of the target date fund market, the design of target date funds. That's where our to and through discussion is. And I think what we proffer here in terms of the relative risks and aims relates to the fundamental goal of mainstream target date funds that aren't calibrated for some other different purpose like an Anderson. So I think that would be contained in our discussion from paragraphs 146 to 155. Can I ask you, the defendants provided a chart of the risk allegations, the allocation of, you know, percentage of equity over time, and you didn't provide any similar chart that talks about risk allocation. You could have, right, because the defendants are saying that's publicly available information and that's what they use to create their chart. Do you have anything similar to that that talks about risk allocation in your complaint? I apologize for speaking over you if I did, your honor. We don't similarly have a chart like this because the specific determinations with respect to the Roche TDFs were not public information prior to us filing the complaint. And if the chart you're referring to is the one that appears at SER4, I do want to make special note that this is not actually the chart that appeared in the fact sheets in the Roche TDFs. But that has Genentech on the chart. You're saying that's not, Genentech is not Roche TDF. It is the Roche TDF, but the little asterisk, the footnote here indicates that for presenting this chart, defense counsel took out commodities which are defined in the Roche TDF fact sheets as a growth asset. And so they actually are equity-like when implemented in the context of the Roche TDFs. So when that is corrected and that appears in the glide paths presented in the fund fact sheets, which I think are Exhibit 4 in the SER, the glide path actually increases on the equity score and comes fairly into line with all the rest to the extent it ever really deviates. Mr. Barron, aren't these kind of factual quibbles the reason we said in COJA that we're quite skeptical of looking outside the complaint, at least in securities cases? I mean, so I guess with respect to the plan document and the charts that are in the plan documents, maybe we could consider those as incorporated by reference, but was this chart before the district court and on what grounds were we able to consider it outside the bounds of the complaint? Defendants did seek to have the court consider it as judicially noticed. We did oppose that and it was discussed in the record below. And I think it's fairly in the record here, but I do think Your Honor's point about- But it sounds like there's a dispute about it, which would not make it subject to, I mean, maybe the facts of the facts, you're just suggesting it's irrelevant because there's a chart that better reflects the glide paths. So that one particular exhibit, SER 4, I don't believe was judicially noticed. I think that came in a brief by defendants. I think the fund fact sheets were judicially noticed. So what I was referencing that included the actual glide path provided to participants. And that one is, just to be clear, that one is where? The one that was properly noticed below? I believe those appeared at SER, in one instance, SER 23 includes the glide path as well as SER 17. There are a couple of different fund fact sheets here. Can I ask you, you conceded that J.P. Morgan would be the right comparator to Judge Johnstone because it's actively managed, it's a two account, but the Roche TDF beat the J.P. Morgan in two years, 2016 and 2018. So how are we to find that it's imprudent when it actually was superior? So in those individual years, it did have superior performance to the J.P. Morgan's returns. That was not on a three or five year basis as prescribed by the IPS. And we do think that the IPS's own stated guidelines here. Why is that not a three year basis, 2016 and 2018? Let's say you looked at the three year 2016, 2017, 2018. You think that's not on a rolling three year basis showing superior performance? I think the performance Your Honor might be referring to is annual performance, which was just a one year basis in those years. And then the trailing three year metric actually showed that the Genentech funds did not outperform the J.P. Morgan funds. The same goes for five year, which was highlighted in the IPS. I'm interested in the last point you just made, and you don't have to watch the clock. My guess is that Judge Koh will be kind enough to give you a little time for rebuttal. Are you contending that in any year in which the offered fund doesn't outperform a peer fund, that the fiduciary must switch funds, even if in previous years it outperformed it? No, Your Honor. Our argument is not for knee jerk replacement. But you see, that's I think what your answer to Judge Koh's question suggested. There was a three year period where the offered fund outperformed the J.P. Morgan fund. But you said, well, but not in the last year. And it seems to me if that's the test, then fiduciaries have to switch every year without knowing how the new fund is going to perform in next year. That can't be the test, can it? I would agree that that's not a fair statement of the test and not what Anderson requires, Your Honor. But here I think, if I'm understanding the question correctly, and perhaps I confused it in my response, the trailing three year metric is a financial metric, and trailing five year financial metric highlighted by the IPS is the fiduciary should have been looking at. That is different than each of the single year returns, because it incorporates a longer time period. And that's the determination that the fiduciary's made would be the relevant guideline to look at. And over those periods, the Roche TDFs underperformed, even if you move that window throughout the class period here. And that is the underperformance that we suggest should have been observed under the IPS itself, which, again, is different than or other cases where underperformance was untethered to an actual process allegation like this. Let me ask you one other question before you stop here. You have not asked either in the district court or here for leave to amend your complaint, is that correct? There's no pending request to amend, Your Honor. Okay, thank you. Sure. I had one last question. What is the amount of underperformance that constitutes imprudence? Here, I mean, here, you're, I guess, with JP Morgan, you're saying, well, Roche TDF underperformed JP Morgan by 100 million over five years. So what is that number? And is it relative to the percentage of the plan's total assets? Here, the plan is 9.4 billion. Just give us some sense of where's the line. Sure, Your Honor. And this is a tricky question because ERISA doesn't include a materiality element. And this is not a question that's largely been answered in the case law. I think the numbers that we're talking about here, based on a percentage of plan assets and from a magnitude perspective, far exceed whatever the line would have been. I think a question about materiality may be a fact-found question that could be litigated later in the case. But under the strictures of the IPS that the plan adopted, there was no threshold. And if you look at the exhibits to our complaint, which I think are ER 115 to 132 and thereabouts, the amounts of underperformance that are reflected year over year against every comparative data point are in the hundreds of basis points frequently, or more than a couple of percent. And that is a significant enough amount that most courts observing that kind of underperformance have found that sufficient. And I think also, I just do want to clean one thing up, if I may. The JP Morgan Fund being an active in a two fund, I think, puts it right in the heartland of a fair comparator. I still do think, and it's our position, that the other comparators are relevant under the terms of this IPS and in our other allegations. I just didn't want to leave that bit behind. All right. Thank you. We'll give you two minutes for rebuttal. Thank you, Your Honor. Go ahead, please. Good morning, and may it please the court, Sarah Hogarth for the defendants at Belize. Anderson confirms that the district court applied the correct pleading standard to this amended complaint. The amended complaint principally relies on performance comparison in an attempt to obtain an inference of imprudence. And the complaint provides no basis from which to infer imprudence based on underperformance, particularly in light of the court's holdings in Anderson. So I'd like to jump first to the composite benchmark. Council has conceded that we had a custom composite benchmark that tracked our custom TDFs and that we performed against. I think Anderson disagreed with the proposition that you should ignore custom composite benchmarks like that. And the articles cited reference creating custom composite benchmarks like we did. The investment policy statement shows how we built it. And the fund facts sheets in the record at SCR 14, for example, use that custom composite. What do we make of the fact that just consistently the Roche TDF performed, underperformed relative to the S&P target date indices and largely underperformed historically the JP Morgan TDF? I mean, it's one thing for me to say, well, I'm running my account and let me just set up what is my benchmark. It's a bit self-serving, isn't it? Saying, well, I'm just going to compare myself against what I want to compare myself to. That's a little bit less credible than actually comparing yourself to actual people in the market who are doing the same thing. Well, I think it reflects trying to track the strategy that you've decided to implement. So if you look at, for example, SCR 163, and this is the investment policy statement where plaintiffs say we supposedly said that we would measure ourselves against the S&P indice, which is just a mischaracterization of the document, which I'm happy to confirm. But what you see here is each of the vintages of the Roche fund. So Roche 2020 fund has the 2020 composite index. Underlying that are the funds that Roche has custom created to go into its tier two. This is, for example, the Roche large cap fund or US small and big cap equity. Each of these is tracked and it lists the market index that each of those funds is tracked against. So you're using a true Russell 1000 index measuring the performance of the Roche large cap fund. When you get to the composite, you are taking these industry benchmarks against each of the different types of asset classes and just making sure that they match the strategy for the asset allocation of that particular custom target date fund. So I don't think it's fair to characterize that as just measuring yourself against yourself. You're making sure that each of the asset categories is performing fairly against an industry benchmark, and then making sure that the TDF is also performing against that. But I want to get back to Judge Koh's question because what your friend is saying is, gee, there are peer funds, whether or not looking at the composite is a good idea or a bad idea, that outperform your funds during the relevant period. Now, whether or not he's sufficiently alleged that they're similar, I want to get to in a second. But would it be enough to say, well, we came up with this composite saying that it was a good idea, and we could ignore the fact that there were peer funds that outperformed the Roche funds during the target period? If he'd sufficiently alleged similarity between the peer funds and the Roche funds, why wouldn't that be enough to get past the motion to dismiss? Well, the first thing is that I think to get to the inference of imprudence, it is important that there is this process to actually measure how the strategy that you have chosen is performing. So I think that is the first thing. Let me interrupt for a second. Let's assume you chose a reasonable strategy back when you put it together, but that over the last five years, it became apparent that some fund with equal risks and the same objectives was grossly outperforming your funds. Wouldn't there be some inference of imprudence by not switching into that fund? And I think that's exactly the analysis that Anderson says to undertake. The plaintiff needs to allege that that exists. So tell me why they haven't sufficiently alleged that. Sure, and I'll separate. So the S&P indice, I'll set that aside, but go to the funds that we're talking about. These are off-the-shelf funds. That's the allegation. There are no factual allegations as to why they are similar, other than so far as I can tell, paragraph 133 in the complaint, which is a statement that is common to all TDFs. But what about JP Morgan? That's an actively managed to retirement fund. Why isn't that a but I think there are multiple reasons. So even just starting with like the fund fact sheet, we can take a look at that. So our fund fact sheet for the 2025 fund, that is at SCR 14. And this will illustrate the importance of a plaintiff having to allege similarities and account for differences. Our objective says, seeks to provide capital growth and income consistent with its current asset allocation. There's the picture of the asset allocation. Then it says that the strategy aims to achieve this objective by investing in a broadly diversified fund of funds. That's what we're trying to do. You take that and compare that to what JP Morgan says they are trying to do at SCR 68. And it says the fund seeks high total return. Those are two objectives and each of them is illustrated by the different asset allocations that they have chosen. But your investment policy statement says that you expect each investment to outperform its benchmark and median returns for similar alternatives over rolling three to five year periods. Sorry, I just want to make sure I'm looking at the same document. Would you mind telling me where it is? It's SCR 204. It's section D, okay? It's section D, SCR 204. And so if you have JP Morgan TDFs outperforming Roche TDFs on a rolling five year basis, why does that not show that you're not meeting your objectives in your investment policy statement? Yes. So this is saying that each will be measured against the specific benchmark, which is what we've talked about in Appendix B, the composite benchmark, which we were undisputedly meeting, and then compared to a universe of funds with similar characteristics. I think this boils down into exactly the meaningful comparator analysis that the Anderson Court is calling for. The funds have to be similar in order to be compared. Let me push you on that then a little bit. I mean, so we've got 2025 target funds. At least one of them is a two fund and actively managed. I guess my concern here is, lest we eliminate the possibility of pleading a circumstantial imprudence claim based on performance, a defendant can always come in and say, well, there's going to be one more thing that's different. I think, for example, here, right, you're suggesting that the JP Morgan or some of the other comparator funds have different characteristics. But of course, the comparator doesn't have to be identical. It only has to be meaningfully same. So what else would the plaintiff have to show other than verbatim the exact same strategy in your statements to establish a comparator? Well, I think the issue is that the plaintiff here hasn't pled those facts because they haven't pled what makes these similar beyond just gen Y. Why isn't a target date fund that is actively managed to the target date a meaningful benchmark? I think Anderson rejected that sort of logic that you can abstract to that high level of generality to say that they are the same, which is why the instruction is for courts to compare the similarities and the differences. And when you start to look at the differences, those become quite clear, especially in the way that the asset allocation decisions were made and done, reflected in the glide paths that each fund disclosed. Just walk me through, how does that work on a motion to dismiss with the pleadings? So it looks like you've brought in a lot. I'm not sure how much was before the district court, but in your briefs, you've brought in a lot of stuff that I don't think would be under the incorporation by reference doctrine outside of the plan documents to say, well, it turns out they're pointing to these funds, but here's some more information about these funds. Just walk me through how that's supposed to work under our pleading standards. When we're, as I told your friend, we're kind of wary in these cases of defendants bringing a lot of extra stuff in outside of the pleadings when they've alleged a comparator. Of course. I mean, for example, like the strategy for JP Morgan, is that in or outside of the pleadings or incorporated by reference? That was before the district court, the district court took judicial notice of it under the incorporation by reference doctrine because the plaintiff was relying on the JP Morgan fund as a comparator. I have the same concern that Judge Johnstone has. The district court may have taken judicial notice of it. The question is whether that notice was appropriate at the motion to dismiss stage. I'm concerned about the Anderson test to the extent it requires the plaintiff to allege things about the peer funds that may or may not be a public record. So again, help me here that there's a lot of extraneous stuff in this record. Let's assume for a moment that we just had the complaint and your motion to dismiss. Would the judge have been correct in dismissing on that? Yes. And that is what Judge Orrick did. He said they did not allege sufficient similarities beyond this contention that all TDFs are created equal. That is what they allege. And so he said, no, you need to say more in order for me to actually assess that these are, in fact, similar beyond just saying all TDFs follow the same, have the same general concepts or operate in the same general manner. And what is that more other than having, again, their fund fact statement look identical to yours? What more do we need? You haven't told us yet, short of it being the identical profile, which isn't really a benchmark as we usually understand investment funds. Usually when you get benchmarks, we think of similar compositions, but similar, not identical. So what more that wasn't in the complaint is required that is short of being identical? Well, they don't allege anything really about the objectives of each of the different funds. I want you to tell me something that they could have alleged. I mean, they've alleged the aims. We can talk about the risks and rewards, but what more did they have to say other than 2025 to target date fund actively managed? They could have emphasized a similarity in diversification strategy. That is a key difference, but they could have alleged these two have a similar allocation. That's the 50-50 point that you make about your funds that it's okay. Sure. Something like that. That would have been publicly available to them that they could have pleaded that. I think that they could have, yes, based on the fund fact sheets. That's what Judge Johnstone just asked. Was that information publicly available? Yes, we provided the fund fact sheets and have provided the prospectuses for each of these different funds, and they haven't asked for an opportunity, even assuming that they had no way to get access to these, which I don't think is correct. They could have, once we submitted them, asked for leave to amend to actually allege this way, and they didn't do that. I think that's revealing that the similarities don't exist. I'm still having difficulty with the point Judge Johnstone raised, and maybe it's because we're both civil procedure freaks. You get a complaint, and you file a motion to dismiss, and you say you haven't alleged certain facts, and therefore, you haven't stated a cause of action. It's nice that you provided information from which the other side might have derived those facts, but that won't be the case in every complaint. I'm still trying to figure out whether or not the facts that you think they needed to allege with respect to the so-called peer funds were publicly available to the plaintiffs at the time they filed their complaints. If they were not, then it seems to be unfair to punish them for not alleging them. I don't specifically know whether they actually had them or not sitting here today, but these are not from us, the J.P. Morgan prospectuses. These are materials published by each of these different comparative companies. So you derived them from publicly available documents? Yes. Can you, at least for some of the time you have remaining, address what I think is your friend's alternative argument? His argument is that you've identified benchmarks in your investment option performance standards, and as to those, they become in effect peer funds without having to say more. Maybe I'm mischaracterizing his argument, and if I am, he can tell me when he has rebuttal. But if that is his argument, how do you respond to it? So in terms of the benchmarks, we've identified the composite benchmark in our investment policy statement. The allegation in paragraph 150 that we have said we will compare against some other benchmark is just a mischaracterization of the document. So I want to be very clear about what that document actually says that they are characterizing, which is that says the investment manager universes will be composed of professionally managed funds. That means the investment managers are going to be professionally managed funds. Those are Blackstone, Blackrock, Barrow, Hansberger, the underlying, if you look at Appendix A, for example, on SCR 162. Those investment managers are professionally managed funds. That is not saying that we will compare against the S&P 500 index as our benchmark. We have a composite benchmark. In terms of, so I just want to be very clear, that is just not correct characterization of that document, which undercuts this. Is there an allegation in this complaint that the Roche funds have underperformed the committee benchmarks? No, and I think we heard counsel say that they have not. And if you look at the fund fact sheets kind of across the board, we show here's the performance, and then here is the composite benchmark, and they're performing over those. And now last question about that. You're not contending that you can limit the universe of comparable peer funds simply by not listing them as benchmarks, are you? I'm not suggesting that, but what I am saying is that was how we were measuring ourselves, and to get to a plausibly imprudent process from an outcome, that's a highly material fact that when you are performing against the benchmark that actually matches the strategy that you're trying to achieve. I have some questions. In your answering brief and your supplemental brief, you try to follow Intel, and Intel, they specifically told participants that in light of the 2008 market crash, that they were going to be specifically seeking to avoid, you know, large losses and risk and decrease volatility. And in your brief, you kind of allude to that a number of places, and you rely heavily on your argument on the risk allocation glide path chart, whatever. Where is that in any of your investment policy statements? I don't see any of those actual statements that your plan was intentionally conservative. Sure, so two places. So the investment policy statement, the purpose SCR 155, to enable participants to build more appropriately diversified retirement portfolios. Okay, so this is what it says, that each investment option will be adequately diversified to reduce the impact of large losses from single investments, except if the participant selects a That is the same as Intel's explicit statement that in light of the 2008 market crash, they're specifically going to try to decrease volatility. Oh, I just want to make sure I give you a couple more spots. So then in the policy statement, we describe what the TDFs are going to do. And it is that appendix. Why don't you give me a page number, because I have both the 2012 and the 2019 investment policy statements here. So I'd love it if you could just point me to something specific. So I was reading from number five of section C, which in my mind is not as specific as what you have in your briefs. But what else do you think is very specific about this risk allocation, this glide path, other than your glide path chart that you attach to your motion to dismiss? Okay, sure. Yes. So then we describe the TDFs, and we say that appendix A illustrates the glide path. Okay, just give me a number, please. Sorry, that's for example, on SCR 159. But you'll see it in all the investment policy statements describing the TDFs. They incorporate the glide path. No, no, no, just give me a specific. I have the document here, and I just want to understand what the allegation is. So the general statements are not as helpful. I'm just trying to find it in the document. Give me when you quote a sentence. Sure. So under, do you see tier one target date funds? I do. So appendix A illustrates the glide path. So I don't see that on SCR 159 or SCR 203. Just give me a sentence, please. Appendix A illustrates the glide path. That's in the second paragraph describing the tier one target date funds on SCR 159. And it's actually incorporating appendix A. It's the last sentence of the second paragraph. Okay, I see that. Okay. So when you look at this investment policy statement actually incorporates, here's how we're going to allocate the assets. This reflects the diversification. What did we tell people? I want to go to the fund facts sheet. And this is SCR, starting at SCR 14. I'll just use the 2025 fund for, as an example. And we've, I've mentioned this already, but again, it says we are going to provide capital growth and income consistent with the current asset allocation. Shows what that is. And then says it aims to achieve this objective by investing in a broadly diversified fund of funds. Again, reflecting what broad diversification does, which is reduce some of the volatility. And then on SCR 15, there is a description in particular, this is at the very bottom of SCR 15, but that the JP Morgan Core DCPF is designed to deliver the strategic diversification and volatility reduction benefits of private core real estate. Reading this all together, you can see exactly what this is doing, which is diversifying in this particular way and emphasizing that some of this is going to provide volatility reduction. Let me ask you another question. What should we make of the fact that Russell only had four clients and is down to two and they had to exit the retail target date market? Yes. And there was no change in management. What should we make of that? Sure. So a few points here. Without the appropriate underperformance allegations, the allegations... Well, let's say we think, or I think that the underperformance relatives, the S&P target date indices and JP Morgan satisfies that first requirement. Okay. I would like to, if I could come back to the S&P indice then, but... No, answer my question, please, because you're over and we need to go to rebuttal. So for two points. So the life points retail TDF, the plaintiff does not allege any similarities between that life points off the shelf retail TDF and our fund. The reason they don't is... Okay. You're not answering my question. My question was about Russell. They've had to exit the retail target date market. They've lost 50% of their clients. There's an allegation that there's dubious asset allocation decisions. It's not like Intel. There are just general arguments that an asset class like the hedge fund or an asset class like private equity fund was at fault. What should we make about Russell? The continued employment of Russell as the fund manager. Sure. I do not think that this pushes this inference that we need, that there was a flawed process by the fact that we maintain these custom TDFs for a few different reasons. The off the shelf retail fund, they do not allege any similarities between that and ours or why it did poorly. And the reason is because that one looks like off the shelf TDFs and not like ours. So I don't think that actually moves the needle for the same reason that not alleging similar comparative facts doesn't move the needle. And then on the client numbers, they don't allege facts as to why somebody exited. And the allegation is in fact that some did stay in this relatively emerging market of custom target date funds. And they even referenced an RFP from San Francisco who they say included this fact. And San Francisco did an analysis and retained Russell to engage in these services. So when you put this whole factual picture together, I don't think it is pushing some inference that anyone was asleep at the wheel or not prudently monitoring these, but instead pursuing this diversified strategy that is reflected in the glide paths. Ms. Hogarth, I guess with Judge Koh's permission, I want to circle back to the one distinction that you drew in terms of the more that they should have shown is this diversification mix. And I take it that the Appendix A glide path comparison that you proffered in your brief kind of summarizes all of this. But I'm trying to get... So your argument in terms of the diversification mix, let's just say just broken down into percentage of equities. I'm looking at this and you're saying that the Roche TDS was not comparable, even though, I mean, I'm looking over a 40-year time horizon. And in at least half those years, its allocation to equity was within one or two percentage points of all the other funds. And then in the 25 to five-year glide path, it's maybe 6% to 8% off in equity. So I guess you'd say that actually completely rules it out for purposes of a motion to dismiss that a comparator fund, it can't be a meaningful benchmark because it has 5% to 10% more invested in equity than Genentech. That's the threshold you're asking us to say rules it out as a meaningful benchmark. A few responses to that. So I think this is why the plaintiff needs to allege the things that are similar. And that is just one illustration. There are more diversified items that are different. And as we noted in our chart, our equities number includes real assets. And as I just mentioned, if the real assets, those are actually providing some of the volatility reduction. If those were to come out, then you have an even lower percentage. So I think the point here is that the plaintiff needs to allege why a plan should have selected one or the other to get that imprudence inference. And you can't do that if you're not explaining what the similarities are and accounting for the reasons that they are different. And that's the analysis that Anderson versus Intel suggests the court should undertake. All right. Any further questions from my colleagues? No? All right. Thank you. Rebuttal, please. Obviously, take your time to answer any questions from the panel. Go ahead, please. You're on mute. Old habits die hard from the pandemic, but I'll try to be mindful of the panel's time. I think, let me just start. Judge Hurwitz, I think I misspoke earlier. We did have a request to amend in our briefing regarding the underlying motion to dismiss. So there was a request to amend before. But on appeal, on appeal, you're not contending that the district court erred by not granting you a motion to amend? That's right. I just wanted to make sure I was clear about that. Since you started with me, let me ask the question that I'm still a little bit confused about. It seems to me you're making two arguments. One is you're trying to compare the performance of the Roche funds to the various funds listed in your complaint on ER 102, Vanguard, T. Rowe Price, JP Morgan, et cetera, BlackRock. And then second, you seem to be making an argument. Well, first, let's focus on that one. How do I know that those funds share the objectives and risk characteristics of the Roche target date funds? Where is there an allegation in the complaint that they do? I understand your point is that because they mentioned them someplace else, they became comparator funds. Let's assume for a moment that argument is not successful. Does the complaint make sufficient allegations about why these are similar enough to the Roche funds to be comparators? Sure, Your Honor. I think Exhibit 1 to our complaint, which goes through target date fund by target date fund, the two-through status as well as the active-passive dynamic is one instance where we talk about the specific risk and strategy. Why don't you talk about one of the, I mean, I think your friend has made, it seems like a pretty strong point. The basic characterization of what makes a benchmark is it's a mix of investments. And whether or not the benchmarks, the difference between them is comparable or not, you don't allege it. Couldn't you have just pleaded that the mix was close enough on the glide path? And why didn't you? Well, sir, to colloquy with my friend about the available information, I actually think that that bears some correction. The J.P. Morgan prospectus, the defendant's site was public because it's a publicly traded fund. It's on the retail markets. Genentech's was not. But the fund fact sheet did contain the glide path mix of the diversification mix, did it not? Just the glide path. It doesn't say what the components of the benchmark are. That appeared in the IPS, which is not a public document. But there's nothing at all about the diversification mix in the complaint, correct? I mean, you didn't even go that far with the public, with the private, but the plan information you had, you didn't, right? Couldn't you have drawn that to really square this up? That you had the plan information, you had the glide path, you could compare it to the glide paths of these other pieces, but you didn't. You just looked at performance. And that leaves out maybe that risk and potential reward piece that Anderson says we should be looking for. So the only thing that was public, the IPS is not a public document, not even available to participants. That came in on the fact sheet. The fact sheets were, and what those reflect are simply the glide path at a categorical level. It does not explain the components in great detail and what the benchmark that the Genentech fiduciaries were using was composed of. And I think that's a critical distinction. I do want to point to the- Let me ask you a question before you leave that. Your clients, I take it, were participants in the Roche TDF funds, yes? They were. So didn't they have access to the mix? Just the fund fact sheet, not the IPS until litigation. You mean so when they invested, they didn't know what the mix of investments was? Not beyond the fund fact sheet presentation. And I think critically, they didn't know what the benchmark was composed of. But let's assume for a moment that the difficulty with your complaint isn't identifying the objectives and risks in the TDF funds, but rather the comparator funds. At least that's what I'm focusing on for a moment. I'm still not sure where I see, as to these specific funds that you say are comparators, the information that Judge Johnstone is asking about. I'm looking at the exhibits, but all they do is talk about returns. They don't talk about mix of investments. They don't talk about objectives. Now, maybe Anderson's unfair in requiring that. But do you agree that you really don't provide that information in the complaint? I don't think we've gone to the level of granularity that's been suggested in some of the discussion today. But I think what's important to keep close about Anderson, Anderson was a case where comparators were proffered, contrary to what the IPS of that plan said. And the miners case, and the other cases where the meaningful benchmark standard comes from, involved a single investment challenge where the plaintiffs came forward with another investment and explained that based on underperformance compared to that investment, there is a plausible inference of a fiduciary breach. Here, we're really talking about something fundamentally different. And that's why I'm pushing back on you a little, because I don't think the Roche plan identifies these as comparators. And I may be wrong about that. And I'll take a closer look at that. It does identify a bunch of composite benchmarks, if you will. And you don't seem to allege that the plan underperformed those benchmarks. So if these are not alleged in the plan as comparators, and I know you say they are, how can I conclude that they're reasonable comparators? Sure. I just want to be really clear about where we get that from, because my friend on the other side did not read this page. I think Judge Koh did when asking the question. But for example, on SCR 160, the IPS specifically says each active investment option is expected to outperform its benchmark and median returns for similar investment alternatives over rolling three and five year periods. Then later, it repeats that same language, median returns for similar investment alternatives and makes reference to the universe. And so what we're really pleading is... So how do I know that these are similar investment alternatives from the allegations in your complaint? First, the S&P target date indices, we plead exactly why that's representative of the universe. In fact, its stated goal is to amalgamate the market investment universe for target date funds of a kind that would be available to the Roche plan for investment. We plead that that is a proxy for what the IPS is seeking here. With regard to the other market target date funds, it's the two through active passive that we plead. And again, we suggest that that whole collection of comparators and with very few exceptions, which I will concede there are a couple of exceptions, these were evidently underperforming those. And so we've come forward and pled that those are the way to interpret the IPS. What's happening here is my friend on the other side is saying, no, actually, the IPS should be interpreted this other way. We strongly feel that we've pled something plausible under the IPS. And what we're talking about is the defendant suggesting that it should be interpreted some other way that frankly, I can't reconcile with what it says. And so, the reason that we think the S&P indices and comparators are relevant are the guidelines that the defendants chose for themselves. And the language of Anderson repeats the miners case and plaintiff can use the data about selected funds and some circumstantial allegations about methods to show that a prudent fiduciary and like circumstances would have acted differently. The methods that we're talking about are the IPS application and then the Russell allegations that I didn't talk about earlier, but as your honor is referenced for really that there was capital flight from Russell's TDF program. There was bad press. Those are the kind of circumstantial allegations. You look at the LinkedIn or prime healthcare cases within the circuit, the court's credit as indicia of imprudence. And so, whereas Anderson had a general allegation. When do you think that the Roche TDF should have or Genentech should have fired Russell? At what point? I mean, I think during the earliest parts of the class period, when this three and five year analysis would have shown underperformance, but certainly no later than 2015, 16 and 17, when there was information in Morningstar reports and from other clients of Russell that they were leaving the funds and really what the fiduciary is, what prudent fiduciaries would do. Can I ask you, 2016 and 2018 is when the Roche TDF beat the JP Morgan off the shelf fund. So you're saying fire them at the moment that you actually outperform your comparator? There was one year of positive annual returns against that comparator there. But still, they weren't satisfying the IPS criteria for rolling three and five year returns at any point during the class period against these comparators. And so, you know, I think with the Russell allegations that would cause any prudent fiduciary, they were managing over a billion dollars in these target date funds. If a prudent fiduciary had learned that they only had four clients left and yet another left the year after that, and that they shuttered their own target date funds that were comparable. But we don't know about those funds. What if the two clients left are the two largest in the industry? Would that be a basis to fire them? I think it has to be a basis to do a thorough investigation. And I do just want to say with respect to the Russell LifePoints funds, which were Russell's retail target date funds, my friend on the other side suggested that we haven't pled why they're similar. Our allegation is quote, based upon the investment components and glide path of the Roche TDFs, it is apparent that the word custom is a misnomer. That is because the Roche TDFs function in the same manner as the off the shelf target date funds and do not appear to account for any specialized demographics or preferences of plan participants relative to Russell's other funds. I think at the components, they're ostensibly a clone of Russell's other funds. You in your complaint just say that the long-term poor results was the result of Russell's dubious asset allocations. Do you have any specifics? And if not, why are they not included in the complaint? Is that non-public information? So I think the asset allocation decisions are discussed in the Morningstar report, addressed in the complaint. I think our other allegations are that Russell had a persistent history of underperformance with respect to its retail TDFs and then exited that sector and shuttered those funds. Those are the allegations that from our perspective would have put a fiduciary on notice that there were persistent problems with Russell's platform and looked into their own funds. And had they done that in a consistent way with their IPS, they would have seen the performance track record that begged investigation. And the IPS also on that same page, SCR 160, when talking about investment managers like Russell, indicates that an organizational event would trigger immediate review. And so we're simply walking through in the complaint the process that the fiduciaries chose for themselves. And at this juncture, I think the way to interpret the investment policy statement needs to be consistent with the allegations in the complaint and not some suggestion that another path was chosen but not made known to anybody. And I think similarly, the discussion about the potential reaction to the 2008 financial crisis is kind of made a whole cloth in reaction to the Anderson decision. The part that was read of the IPS relates to the as a whole and nowhere mentions the Roche TDS. And so I think it's kind of stark that we're seeing for the first time on appeal, a narrative concerning an alternative interpretation or explanation for the Roche TDS that's just inconsistent with the documents certainly cited in the complaint and what else came in by way of judicial notice. Do my colleagues have any further questions for counsel? No, I do not. Go ahead, please. Oh, you said you do or do not. Sorry, I misheard you. Okay, thank you very much to both counsel. This was a really helpful argument and this case is now submitted. Thank you both very much. Thank you, Your Honor. Thank you, Your Honor. This court for this session stands adjourned.
judges: HURWITZ, KOH, JOHNSTONE